**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| TIFFANIE A. McWHORTER, | CASE NO. 5:13-CV-2117 |
| Plaintiff, | JUDGE LIOI |
| v. | MAGISTRATE JUDGE VECCHIARELLI |
| CAROLYN W. COLVIN, Acting Commissioner of Social Security, | |
| Defendant. | **REPORT AND RECOMMENDATION** |

Plaintiff, Tiffanie A. McWhorter ("Plaintiff") challenges the final decision of

Defendant, Carolyn W. Colvin, Acting Commissioner of Social Security

("Commissioner"), denying her applications for Supplemental Security Income ("SSI")

under Title XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 423, 1381(a) and Period

of Disability ("POD") and Disability Insurance Benefits ("DIB") under Title II of the Act,

42 U.S.C. §§ 416(i), 423. This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).

This case is before the undersigned United States Magistrate Judge pursuant to an

automatic referral under Local Rule 72.2(b) for a Report and Recommendation.  For the

reasons set forth below, the Magistrate Judge recommends that the Commissioner's

final decision be AFFIRMED.

## I.    PROCEDURAL HISTORY

On April 29, 2010, Plaintiff filed applications for SSI, POD and DIB, alleging a

disability onset date of October 15, 2008.  (Administrative Transcript ("Tr.") 18.)

Plaintiff's application was denied initially and on reconsideration.  (*Id*.)  Plaintiff

requested an administrative hearing.  (*Id*.)  On January 3, 2012, an administrative law

judge ("ALJ") conducted a hearing, at which Plaintiff appeared, was represented by

counsel and testified.  (*Id*.)  A vocational expert ("VE") also testified.  (*Id.*)  On February

16, 2012, the ALJ found that Plaintiff was not disabled.  (Tr. 12-29.)  On July 23, 2013,

the Appeals Council declined to review the ALJ's decision, making it the

Commissioner's final decision.  (Tr. 1.)

On September 24, 2013, Plaintiff filed her complaint to challenge the

Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in

this matter.  (Doc. No. 13, 14, 15.)

Plaintiff argues that substantial evidence does not support the ALJ's:

(1) analysis of the opinion of Plaintiff's treating psychiatrist; or (2) credibility analysis.

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Plaintiff was born in October 1982, and was 26-years-old on her alleged disability

date.  (Tr. 27.)  She had a limited education and was able to communicate in English.

(*Id*.)  She had no past relevant work.  (*Id*.)

### B.    Relevant Medical Evidence[1]

#### 1.    Plaintiff's Providers

On March 15, 2008, Plaintiff's presented to the emergency department at

Aultman Hospital, requesting a psychiatric evaluation.  (Tr. 281.)  She reported that she

---

[1] The ALJ assigned Plaintiff physical and mental limitations in his determination of her RFC.  Plaintiff, however, challenges the ALJ's decision regarding only her non-exertional limitations.  This Report and Recommendation recites only the medical evidence that is relevant to the issues raised by Plaintiff.

2

had thrown a tray at someone at work that evening, and complained of anger that she could not explain.  (*Id.*)  Plaintiff stated that a physician had recently switched her medication from Risperdal to medications not specified in the record. (*Id.*)  Plaintiff denied suicidal or homicidal ideations, and her family members stated that "she has a swollen blood vessel in her head and when it acts up this is what happens."  (*Id.*)  After an examination and a discussion with Plaintiff, who did not want to be admitted, the emergency department physician diagnosed her with "anxiety, acting out behavior," prescribed Haldol, and discharged her.  (*Id.*)

On June 6, 2008, Plaintiff's family members took her to the emergency department at Aultman Hospital "requesting to have something to calm her down."  (Tr. 279.)  The emergency department physician noted Plaintiff's report that she "has a history of extensive psychiatric illness," and "just needs a shot to help her calm down so she can sleep."  (*Id.*)  Plaintiff denied any suicidal or homicidal ideations, but complained of agitation and difficulty sleeping.  (*Id.*)  Emergency department physicians diagnosed her with acute anxiety, gave her an injection of Vistaril, and discharged her. (*Id.*)

Later on June 6, 2008, Plaintiff arrived at the Mercy Medical Center emergency department, complaining of feeling annoyed and anxious, and having difficulty sleeping. (Tr. 327.)  Her husband reported that she had been aggressive at home.  (*Id.*)  The emergency department physician recommended that Plaintiff be evaluated by the "crisis center," but the records do not indicate whether that occurred.  (*Id.*)

On June 16, 2008, Plaintiff arrived at the Aultman Hospital emergency

3

department via ambulance.  (Tr. 296.)  Her family members indicated that she had

bipolar disorder, and had been experiencing mania and difficulty sleeping.  (*Id*.)

Emergency department personnel described Plaintiff has having disorganized speech

with flight of ideas, looseness of associations and pressured speech.  (Tr. 298.)

Plaintiff was combative.  (*Id*.)  Plaintiff was admitted to the psychiatric unit at Aultman

Hospital for eight days, where she was diagnosed with bipolar disorder with psychotic

features, as well as obesity, noncompliance, poor insight and judgment, and a frontal

lobe lesion.  (Tr. 290-91.)  During her admission, Plaintiff told a psychiatrist that she did

not believe that she had bipolar disorder, and, thus, had not been taking two of her

three medications.  (Tr. 294.)  Plaintiff was discharged on June 23, 2008 with

prescriptions for Prolixin, Seroquel, Invega, Lamictal, Cogentin and Lorazepam.  (Tr.

290.)

On June 27, 2008, psychiatrist Sharad H. Bhatt, M.D., examined Plaintiff, who

noted her recent hospital admission, as well as "racing thoughts."  (Tr. 408.)  He

observed that Plaintiff was not manic or impulsive.  (*Id*.)  He noted that Plaintiff was a

high school graduate and was attending college.  (Tr. 409.)  He diagnosed Plaintiff with

bipolar disorder and prescribed Lamictal, Invega and Klonopin.  (Tr. 413.)

On July 3, 2008, Dr. Bhatt noted Plaintiff's complaint of feeling tired and

overwhelmed.  (Tr. 382.)  He advised her to take her medications at night because they

were sedating, and described her as "coping well" and having a "stable" mood.  (*Id*.)

Plaintiff was calm, alert, and cooperative and demonstrated no pressured speech, flight

of ideas, delusions, hallucinations, or suicidal or homicidal ideations.  (*Id*.)  Dr. Bhatt

made similar observations at appointments in August, September, and November 2008,

4

and January 2009.  (Tr. 378-81.)  In August 2008, Dr. Bhatt stated that Plaintiff had "no

other problems" and noted that she was in school and wanted to be a social worker.

(Tr. 381.)  In September 2008, Plaintiff stated that she and her husband wanted to a

have a child, and Dr. Bhatt advised her to wait six months "which would give her almost

a years [*sic*] worth of stability."  (Tr. 380.)  In November 2008, Plaintiff stated that

"things," including her work, were "going well," and reported good sleep, appetite,

energy and mood.  (Tr. 379.)  In January 2009, Dr. Bhatt noted that Plaintiff had been

stable for six months.  (Tr. 378.)  Throughout 2008 and 2009, Dr. Bhatt continued

Plaintiff on Lamictal, Klonopin, Vistaril and Invega.  (Tr. 378-82.)

In February 2010, Plaintiff's husband reported to Dr. Bhatt that Plainitff had been

"irritable and acting strangely," and expressed concern that she was becoming

psychotic again.  (Tr. 376.)  Dr. Bhatt noted that Plaintiff had not exhibited any

psychotic symptoms during the time that he had been treating her.  (*Id*.)  Dr. Bhatt

described Plaintiff as calm, alert and cooperative with restricted affect, and intact

insight, judgment and memory.  (*Id*.)  She denied suicidal or homicidal ideations.  (*Id*.)

Dr.  Bhatt made similar observations in February 2010, when Plaintiff reported that she

was "feeling better and was not as groggy."  (Tr. 375.)  In March 2010, Plaintiff reported

to Dr. Bhatt that she was trying to finish her associate's degree, and had good appetite,

energy and mood.  (Tr. 374.)

On April 9, 2010, Plaintiff  reported to the Mercy Medical Center emergency

department, complaining of bug bites from "little black bugs all over her house."  (Tr.

332.)  She described itching in various parts of her body.  (*Id*.)  The emergency

department physician did not find any signs of bug bites or other lesions.  (*Id*.)  He

5

prescribed Elimite "just to be safe."  (*Id*.)  Two days later, on April 11, 2010, Plaintiff returned to the Mercy Medical Center emergency department, complaining that "she saw bugs in her pelvic area."  (Tr. 331.)  The physician was unable to find any signs of bugs bites or infestation.  (*Id*.)  He gave her "a great deal of reassurance" and instructed her to follow up with her primary care physician.  (*Id*.)

Later on April 11, 2010, Plaintiff returned to the Mercy Medical Center emergency department, complaining of anxiety, depression and feeling jittery.  (Tr. 335.)  She denied suicidal or homicidal ideations.  (*Id*.)  The emergency department physician noted that Plaintiff had normal through processes and thought content, stable mood and normal affect.  (*Id*.)  The physician prescribed Ativan and discharged Plaintiff with instructions to follow up with her psychiatrist.  (*Id*.)

On April 13, 2010, Dr. Bhatt noted Plaintiff's belief that she was infested with insects.  (Tr. 373.)  He concluded that she was "acutely psychotic" and admitted her to the psychiatric unit of Mercy Medical Center.  (Tr. 348, 373.)  Physicians prescribed Haldol, and Plaintiff participated in individual and group therapy and "actually rapidly improved in her thinking."  (*Id*.)  Physicians diagnosed Plaintiff with schizoaffective disorder, bipolar type; hypertension; and obesity.  (*Id*.)  She was discharged on April 17, 2010 "in an improved mood."  (*Id*.)

In May 2010, Dr. Bhatt noted that Plaintiff was "back to normal," and was "functioning normally."  (Tr. 372.)  He continued her on Haldol, Trazadone and Metoprolol.  (*Id*.)  He observed that Plaintiff was calm, alert and cooperative with intact insight, judgment and memory.  (*Id*.)  Plaintiff denied suicidal and homicidal ideations,

hallucinations and delusions.  (*Id*.)

In March 2011, Dr. Bhatt noted Plaintiff's report that "things in general were stable," and that she was "going to university."  (Tr. 436.)  She reported good sleep, appetite, energy and mood.  (*Id*.)

On May 9, 2011, Dr. Bhatt admitted Plaintiff to Mercy Medical Center, noting that she had reported to him that she had not been taking her medications.  (Tr. 447, 465.)  He opined that she was becoming psychotic again. (Tr. 465.)  She was withdrawn, and had difficulty focusing, functioning and processing information.  (Tr. 447.)  At Mercy Medical, Plaintiff was given Haldol and Trazodone, and "rapidly stabilized."  (*Id*.)  Dr. Bhatt discharged Plaintiff on May 13, 2011 "in improved condition."  (*Id*.)  He diagnosed Plaintiff with schizoaffective disorder, bipolar type with depression.  (*Id*.)

Later in May 2011, Plaintiff stated that "things in general were much better," and that she had good appetite, energy, sleep and mood.  (Tr. 464.)  Dr. Bhatt continued her on Haldol and prescribed Cogentin.  (*Id*.)  In June 2011, Plaintiff reported that she was back in school and that things were going well.  (Tr. 463.)  She stated that she had good sleep, appetite, energy and mood.  (*Id*.)  Dr. Bhatt described her as calm, cooperative and alert, with no pressured speech, flight of ideas, delusions, hallucinations, or suicidal or homicidal ideations.  (*Id*.)  He made similar observations in December 2011, when Plaintiff reported that "things were stable."  (Tr. 498.)  Dr. Bhatt continued Plaintiff on Haldol and Trazodone, and scheduled her next appointment for four months later.  (*Id*.)

On December 27, 2011, Dr. Bhatt completed a mental residual functional

7

capacity ("RFC") questionnaire.  (Tr. 499-503.)  He indicated that Plaintiff had schizoaffective disorder, bipolar type, with a "guarded" prognosis.  (Tr. 499.)  He listed the following clinical findings: "restricted affect, concrete thinking, thought block, [decreased] self-care [and] difficulty understanding and processing."  (*Id*.)

In a section of the questionnaire entitled "mental abilities and aptitudes needed to do unskilled work," Dr. Bhatt opined that Plaintiff was seriously limited, but not precluded[2] in her ability to carry out very short and simple instructions, and make simple work-related decisions.  (Tr. 501.)  He determined that she was unable to meet competitive standards[3] in her ability to remember work-like procedures, and understand and remember very short and simple instructions.  (*Id*.)  Dr. Bhatt opined that Plaintiff had no useful ability to function[4] in her ability to: maintain attention for two hours; maintain regular attendance and be punctual within customary, usually strict tolerances; sustain an ordinary routine without special supervision; work in coordination with others without being unduly distracted; complete a normal workday and workweek without interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; accept instructions and

---

[2] The questionnaire defined "seriously limited, but not precluded" as "ability to function in this area is seriously limited and less than satisfactory, but not precluded in all circumstances."  (Tr. 501.)

[3] The questionnaire defined "unable to meet competitive standards" as "cannot satisfactorily perform this activity independently, appropriately, effectively and on a sustained basis in a regular work setting."  (Tr. 501.)

[4] The questionnaire defined "no useful ability to function" as "an extreme limitation, means your patient cannot perform this activity in a regular work setting."  (Tr. 501.)

8

respond appropriately to criticism from supervisors; get along with peers without unduly distracting them or exhibiting behavioral extremes; respond appropriately to changes in a routine work setting; deal with normal work stress; and be aware of normal hazards and take appropriate precautions.  (*Id.*)

With respect to the "mental abilities and aptitudes needed to do semiskilled and skilled work," Dr. Bhatt opined that Plaintiff had no useful ability to function in any of the required abilities, which were: understanding and remembering detailed instructions; carrying out detailed instructions; setting realistic goals or making plans independently of others; and dealing with stress of semiskilled and skilled work.  (Tr. 502.)  Dr. Bhatt opined that Plaintiff was limited but satisfactory in her ability to adhere to basic standards of neatness and cleanliness, and was unable to meet competitive standards in her ability to: interact appropriately with the general public; maintain socially appropriate behavior; travel in an unfamiliar place; and use public transportation.  (*Id.*)  Finally, he opined that Plaintiff's impairments would cause her to be absent from work more than four days per month.  (Tr. 503.)

### 2.    Agency Reports

In October 2010, agency consulting psychologist Deryck Richardson, Ph.D., performed a psychiatric review technique and mental RFC assessment.  (Tr. 128-32.) He opined that Plaintiff had a mild restriction in her activities of daily living, and moderate difficulties in social functioning; and maintaining concentration, persistence and pace.  (Tr. 129.)  He assigned Plaintiff a moderate limitation in her ability to: complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number

9

and length of rest periods; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; respond appropriately to changes in the work setting; and set realistic goals or make plans independently of others.  (Tr. 130-31.)  He determined that Plaintiff was not significantly limited in her ability to: carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; sustain an ordinary routine without special supervision; work in coordination with or in proximity to others without being distracted by them; make simple work-related decisions; ask simple questions or request assistance; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; be aware of normal hazards, and take appropriate precautions; and travel in unfamiliar places or use public transportation. (Tr. 130-31.)

With respect to Plaintiff's limitations in sustaining concentration and persistence, Dr. Richardson noted that Plaintiff's "h[istory] o[f] decompensations . . . indicate[s] that stress tolerance is impaired.  Thus, while she has been able to attend college, reduced stress tolerance limits her to routine tasks of 3-4 steps not requiring rapid pace."  (Tr. 131.)  Further, Dr. Richardson noted that Plaintiff's impaired stress tolerance limited her to "superficial contact with others," and to "routine tasks that do not require great initiative."  (*Id*.)  He pointed out that, "prior to the decompensation in [April 2010], [Plaintiff] had been fairly stable since at least [September 2008].  Dr. Richardson opined that Plaintiff's mental RFC was as follows:

> [Plaintiff] is able to perform a wide range of tasks.  No strict
> time or production quotas and changes to routine should be
> explained and not frequent.  She is also limited to superficial
> contact with others.

(*Id*.)

C.    **Hearing Testimony**

1.    **Plaintiff's Hearing Testimony**

At her January 2012 administrative hearing, Plaintiff testified as follows:

She graduated from high school in 2002, and had received assistance in passing

her proficiency tests.  (Tr. 44.)  She began taking classes at Stark State in fall of 2005.

(Tr. 45.)  She started there with a major in massage therapy, but had studied

"numerous majors," including social work, early childhood education, dental hygiene,

and medical instrument sterilization.  (Tr. 45-46.)  She dropped out of Stark State in

summer of 2011 because she "couldn't do it anymore.  I have been – I was just in 2005

and it was getting anywhere, so i just figured it might [be] best that I would just quit

while I was further ahead with my loans and stuff that I've taken out over them years."

(Tr. 46.)  Plaintiff had difficulties with the course work, specifically, "comprehension,

remembering what I read, just trying to stick with the programs of the majors."  (Tr. 47.)

Plaintiff did not obtain a degree.  (*Id*.)

Plaintiff estimated that, while she was in school, she had spent a total of ten

hours per week in class and studying.  (Tr. 47-48.)  She took two classes each

semester, which was part time.  (Tr. 47.)  Plaintiff could read and write and perform

simple division and multiplication.  (Tr. 49.)  She did not have a driver's license.  (*Id*.)

Although she had twice passed the computer test to obtain her temporary permit, she

11

had attempted the driving test twice, and failed both times.  (Tr. 49-50.)  While Plaintiff

was in school, she took public transportation to her classes.  (Tr. 86.)

Plaintiff had worked part time at Big Lots, stocking and arranging shelves and

returning merchandise to shelves.  (Tr. 51-52.)  She had never worked more than 20

hours per week.  (Tr. 51.)  She had requested more hours, but never received them.

(*Id*.)

During the relevant period of time, Plaintiff lived in an apartment with her

husband.  (Tr. 53.) During a typical day, she would wake up, make breakfast, wash

dishes, do laundry and "ke[ep] up with housework."  (*Id*.)  She would make dinner for

her husband when he returned home from work.  (*Id*.)  Plaintiff visited with her mother,

sisters, nieces and nephews two or three times each week. (Tr. 56.)  She attended

church every Sunday.  (Tr. 56-57.)  She grocery shopped with her husband, and they

ate out about two times each week.  (Tr. 57.)  They went to the movies about once

each week.  (Tr. 58.)

Plaintiff was unable to work because her mental impairments kept her from

attending work regularly:

> I would get sick.  I would have an episode.  I'd be in the
> hospital two weeks at a time.  And I wouldn't be able –
> mentally, I wouldn't be able to hold down a job because my
> mental state, they wouldn't let me quit and for two weeks at
> a time, every month.
>
> I had an episode every month, was in the hospital about
> three times a month, so therefore, I couldn't hold down a job
> because they wouldn't hire me in Big Lots when I was there,
> I got sick twice being there.  The last time I got sick, they
> ended up letting me go because I guess it was too much for
> them to keep bringing back. [I] keep missing work for two
> weeks at a time, they couldn't keep letting me come back at

Big Lots.

(Tr. 61.)  Plaintiff was admitted to the hospital when she failed to "take her medicine every night like I'm supposed to ro I run out of medicine and I can't get the medicine right away."  (Tr. 62.)  When Plaintiff took her medications as directed, she did not have the problems that caused her to go to the hospital.  (Tr. 63.)  Generally, when she did not take her medication, it was because she and her husband did not have the money to buy it.  (*Id*.)  Her medication cost between $10 and $30 per month, and her husband brought home about $1,400 each month.  (Tr. 65-66.)  They ran out of money each month because they paid out more than he brought in.  (Tr. 66.)

Plaintiff had difficulty remembering to do things, such as attending appointments or performing chores, on a daily basis.  (Tr. 66.)  The ALJ noted that Plaintiff's testimony described more frequent and lengthier hospitalizations than her medical records reflected.  (Tr. 68.)  Plaintiff explained that, "maybe I had it wrong then."  (*Id*.)

During questioning by her counsel, Plaintiff explained that her husband assisted her with her household chores.  (Tr. 76.)  He reminded her about appointments and urged her to complete her chores.  (Tr. 77.)  He had to remind her to make meals because she occasionally slept all day and forgot to do so.  (*Id*.)

Plaintiff was not certain whether she could work 40 hours per week, as she had never done so.  (Tr. 82.)  She believed that "stress is the number one reason" for her hospitalizations.  (*Id*.)

## 2. Vocational Expert's Hearing Testimony

The ALJ described the following hypothetical individual of Plaintiff's age, with the

13

same education and work history as the Plaintiff:

> [A]ssume that she's restricted on an exertional basis to
> medium work within the meaning of the Social Security
> regulations.  She is limited to simple, routine, repetitive tasks
> involving only simple work-related decisions and in general,
> relatively few workplace changes.  Changes of routine
> should be explained to her.  She is limited to occasional
> interaction with supervisors.  She is limited to occasional and
> superficial interaction with co-workers and the general
> public.  She cannot interact with others in situations requiring
> substantial negotiation, persuasion or conflict resolution.
> She cannot work in an environment with high quotas, strict
> time limits or deadlines or fast-paced production demands
> such as those encountered in piece-work or on a fast-
> moving assembly line.

(Tr. 91-92.)  The VE opined that the hypothetical individual would be able to perform

work as a laundry worker, a packager or a wire worker.  (Tr. 90-91, 92.)

### III.    STANDARD FOR DISABILITY

A claimant is entitled to receive benefits under the Social Security Act when she

establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y*

*of Health & Human Servs., 667 F.2d 524 (6th Cir. 1981).*  A claimant is considered

disabled when she cannot perform "substantial gainful activity by reason of any

medically determinable physical or mental impairment which can be expected to result

in death or which has lasted or can be expected to last for a continuous period of not

less than 12 months."  20 C.F.R. § 416.905(a).  To receive SSI benefits, a recipient

must also meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 *and*

416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled

14

by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience.  20 C.F.R. §§ 404.1520(d) *and* 416.920(d).  Fourth, if the claimant's impairment does not prevent her from doing her past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

### IV.    SUMMARY OF COMMISSIONER'S DECISION

In his February 2012 decision, the ALJ made the following findings of fact and conclusions of law:

1.    Plaintiff's insured status for the purposes of entitlement to POD and DIB expired on March 31, 2010.

2.    Plaintiff has not engaged in substantial gainful activity since October 15, 2008,

the alleged onset date.

3.  Plaintiff has the following severe impairments: obesity; schizophrenia, with a favorable response to medication; a personality disorder, not otherwise specified; and high borderline intellectual functioning.

4.  Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5.  Plaintiff has the RFC to perform the exertional demands of full range of medium work as defined in 20 C.F.R. §§ 404.1567(c) and 416.967(c).  Mentally, however, Plaintiff is limited to simple, routine, repetitive, tasks involving only simple, work-related decison-making and, in general, few workplace changes.  Changes of routine should be explained to her.  She is limited to occasional interaction with supervisors.  She is limited to occasional and superficial interaction with coworkers and the general public.  She cannot interact with others in situations regarding substantial negotiation, persuasion, or conflict resolution.  She cannot work in an environment with high quotas, strict time limits or deadlines, or fast-paced production demands (such as those encountered in piecework or on a fast-moving assembly line).

6.  Plaintiff has no past relevant work.

7.  Plaintiff was born in October 1982 and was 26 years old, which is defined as a younger individual age 18-49, on the alleged disability date.

8.  Plaintiff has a limited education and is able to communicate in English.

*   *   *

10.  Considering Plaintiff's age, education, work experience and RFC, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform.

11.  Plaintiff has not been under a disability, as defined in the Act, from October 15, 2008, through the date of this decision.

(Tr. 14-29.)

## LAW & ANALYSIS

### A.  Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether

16

the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010).  Review must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ.  *Id.*  However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record.  *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Brainard*, 889 F.2d at 681.  A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion.  *Ealy*, 594 F.3d at 512.

**B.  Plaintiff's Assignments of Error**

Plaintiff argues that substantial evidence does not support the ALJ's: (1) analysis of the opinion of Plaintiff's treating psychiatrist; or (2) credibility analysis.  The Commissioner generally contends that substantial evidence supports the decision in this case.

17

### 1.    Treating Psychiatrist

Plaintiff contends that substantial evidence does not support the ALJ's decision to assign less than controlling weight to the opinion of her treating psychiatrist.  "An ALJ must give the opinion of a treating source controlling weight if he finds the opinion 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and 'not inconsistent with the other substantial evidence in the case record.'"  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(d)(2)) (internal quotes omitted).  If an ALJ decides to give a treating source's opinion less than controlling weight, he must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight.  *See Wilson*, 378 F.3d at 544 (quoting S.S.R. 96-2p, 1996 WL 374188, at *5 (S.S.A.)).  This "clear elaboration requirement" is "imposed explicitly by the regulations," *Bowie v. Comm'r of Soc. Sec.*, 539 F.3d 395, 400 (6th Cir. 2008), and its purpose is to "let claimants understand the disposition of their cases" and to allow for "meaningful review" of the ALJ's decision, *Wilson,* 378 F.3d at 544 (internal quotation marks omitted).  Where an ALJ fails to explain his reasons for assigning a treating physician's opinion less than controlling weight, the error is not harmless and the appropriate remedy is remand.  *Id.*

Further, it is well established that an ALJ may not substitute his own judgment for medical expert opinion.  *See Winning v. Comm'r of Soc. Sec.*, 661 F. Supp. 2d 823-24 (N.D. Ohio 2009) ("Although an ALJ is charged with making credibility determinations, an ALJ does not have the expertise to make medical judgments. . . . [A]n ALJ cannot

substitute her own lay opinion of mental illness for that of a medical expert.") (internal

quotation marks and citations omitted).   For example, in *Winning*, the court concluded

that the ALJ had improperly substituted her own judgment for medical expert opinion

when the ALJ "used her own opinions about what symptoms a person with anxiety

should exhibit to discount" the plaintiff's testimony.  *Id*. at 824.

In this case, the ALJ assigned "little weight" to the opinion of Dr. Bhatt, who

opined in December 2011 that Plaintiff was "unable to meet competitive standards" or

had "no useful ability to function" in the vast majority of work-related areas.  (Tr. 27.)

Specifically, the ALJ concluded that Dr. Bhatt's "own treatment records do not

document this level of dysfunction, which would require virtual around-the-clock care

and supervision.  Moreover, the frequency of [Plaintiff's] sessions with Dr. Bhatt are not

consistent with a person as limited as Dr. Bhatt opines."  (Tr. 26-27.)  According to

Plaintiff, the ALJ erred by substituting his own judgment for medical opinion when the

ALJ opined, first, that the individual described in Dr. Bhatt's December 2011 response

to the RFC questionnaire would require "virtual around-the-clock care" and, second,

that such an individual would require more frequent treatment visits than Plaintiff

attended with Dr. Bhatt.

Plaintiff's arguments are not well taken.  Although the challenged portions of the

ALJ's reasoning on this issue are speculative and arguably resemble the type of

reasoning rejected by the court in *Winning*, remand is not appropriate in this case

because the ALJ's opinion, reviewed in its entirety, reflects that the ALJ considered

other evidence to support his opinion.  The ALJ did not rely solely on his belief that

someone with the limitations described by Dr. Bhatt would require a certain level of

19

supervision or a different frequency of treatment.  Rather, the ALJ also noted that Dr.

Bhatt's treatment notes were not consistent with the level of limitation he described in

his December 2011 questionnaire response.  (Tr. 26 ("[H]is own treatment records do

not document this level of dysfunction . . . ").)  Substantial evidence in the record

overwhelmingly supports this portion of the ALJ's reasoning.  Throughout his treatment

of Plaintiff, Dr. Bhatt described Plaintiff as coping well or doing well, being calm and

cooperative, and as having a stable mood or functioning normally.  When Plaintiff

indicated that she and her husband were considering having a child, Dr. Bhatt advised

her to wait six months so that she would have had a year of "stability" on her

medications.  In other words, when Plaintiff was compliant with her medications, Dr.

Bhatt's treatment notes do not reflect any of the substantial deficits he described in his

response to the RFC questionnaire.  The only times his treatment notes reflect

significant problems were when Plaintiff stopped taking her medications.  Further, even

in those instances, Dr. Bhatt's notes reflect that, once Plaintiff resumed taking her

medications as required, she rapidly stabilized and was released from her

hospitalizations in improved condition.  Plaintiff points to no evidence in the record that

supports the significant limitations assigned by Dr. Bhatt.  Accordingly, substantial

evidence supports the ALJ's conclusion that Dr. Bhatt's December 2011 opinion is

inconsistent with his notes of Plaintiff's treatment.

> ## 2.    Credibility Analysis

In his decision, the ALJ stated as follows:

> [A]fter a careful consideration of the record and from the
> opinion evidence as weighted, I find that [Plaintiff] has the
> [RFC] for medium work. . . . [Plaintiff] testified that she was

20

> hospitalized for 2 weeks at a time during her admissions,
> which is not consistent with the medical evidence. [Plaintiff]
> also testified that she has been hospitalized 3 times per
> month, which is also not supported by the record. [Plaintiff]
> described performing extensive activities of daily living, and
> this testimony is consistent with the record.  The record
> corroborates that [Plaintiff] attended school into 2011, and
> that she utilized public transportation in doing so.  The
> record corroborates [Plaintiff's] generally stable baseline
> functioning when she remains medication compliant.
> Nevertheless, the record also demonstrates that [Plaintiff],
> even at baseline, has substantial work-related limitations in
> functioning as a result of her impairments, which limitations
> are incorporated in the RFC as found herein.

(Tr. 27.)  Plaintiff contends that this portion of the ALJ's decision constitutes a credibility

analysis and, that the ALJ's analysis of Plaintiff's credibility lacks support in the record

because: (1) the ALJ failed to consider Plaintiff's cognitive and memory impairments in

determining that her testimony regarding her hospitalizations was not credible;

(2) Plaintiff's testimony regarding her household chores reflected that she received

assistance from her husband to complete them; and (3) the ALJ's characterization of

Plaintiff as "stable" when on medication substitutes his own judgment from medical

opinion.

As a preliminary matter, it is not clear that the challenged portion of the ALJ's

decision is actually a negative credibility finding.  Although the ALJ notes that Plaintiff's

testimony regarding her hospitalizations was inconsistent with the medical evidence, he

does not explicitly rely on that fact to discredit her testimony.  Similarly, he does not

specifically connect either her testimony regarding her household chores, or the fact

that the record reflected that she was generally stable while on medication, to Plaintiff's

credibility.  Rather, the portion of the ALJ decision quoted above appears to explain why

21

the ALJ assigned Plaintiff some of the restrictions he included in her RFC, not why he disbelieved her allegations regarding the severity of her impairments.

Further, to the extent that the ALJ's opinion can be read to determine that Plaintiff was not credible, such a conclusion would be supported by substantial evidence in the record.  Credibility determinations regarding a claimant's subjective complaints rest with the ALJ, are entitled to considerable deference, and should not be discarded lightly.  See *Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987); *Villarreal v. Sec'y of Health & Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987).  However, the ALJ's credibility determinations must be reasonable and based on evidence from the record.  See *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 249 (6th Cir. 2007); *Weaver v. Sec'y of Health & Human Servs.*, 722 F.2d 313, 312 (6th Cir. 1983).  The ALJ also must provide an adequate explanation for his credibility determination.  "It is not sufficient to make a conclusory statement 'that an individual's allegations have been considered' or that 'the allegations are (or are not) credible.'" S.S.R. 96-7p, 1996 WL 374186 at *4 (S.S.A.).  Rather, the determination "must contain specific reasons for the finding on credibility, supported by evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reason for that weight."  *Id.*

Here, the ALJ correctly noted that Plaintiff's testimony regarding the frequency and duration of her hospitalizations was inconsistent with the medical evidence. Although Plaintiff testified that her impairments affected her memory, there was no medical evidence in the record – other than Dr. Bhatt's December 2011 opinion, to

22

which the ALJ assigned little weight – to support that testimony.  Accordingly, the ALJ did not err in relying on the inconsistency to support a finding that Plaintiff was not credible.  Further, although Plaintiff testified that she required her husband's assistance with chores and to remember appointments, Plaintiff testified to other daily activities, such as visiting with family and friends; attending church; and going shopping, to the movies and out to eat with her husband, that were consistent with the ALJ's characterization of Plaintiff as engaging in "extensive" activities of daily living.  Finally, the ALJ's characterization of Plaintiff as "generally stable" while on medication does not constitute a substitution of his own judgment for medical opinion.  Rather, it echoes the opinion of Plaintiff's own treating psychiatrist, who characterized Plaintiff as stable while on her medications on multiple occasions during Plaintiff's treatment.  Accordingly, to the extent that the challenged portion of the ALJ's decision constitutes a negative credibility finding, substantial evidence supports it.

23

## VI.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the

Commissioner's final decision be AFFIRMED.

_____          s/ _Nancy A. Vecchiarelli_____
                                           U.S. Magistrate Judge

Date: June 4, 2014

_____

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See _United States v. Walters_, 638 F.2d 947 (6th Cir. 1981); _Thomas v. Arn_, 474 U.S. 140 (1985), _reh'g denied_, 474 U.S. 1111 (1986).**

24